**In re James D. and Betty SMITH, Debtors.**

No. 00–33106.

United States Bankruptcy Court, S.D. Ohio, Western Division.

March 30, 2001.

Lester R. Thompson, Dayton, Ohio, for debtors.

John H. Slavens, Dayton, Ohio, for Rahn Hills Chiropractic, Hollencamp & Hollencamp.

Thomas R. Noland, Dayton, Ohio, Chapter 7 Trustee.

### MEMORANDUM OPINION

JOHN E. HOFFMAN, Jr., Bankruptcy Judge.

The debtors, James Smith and Betty Smith (the "Debtors"), have filed a motion (the "Motion") seeking the avoidance of a judicial lien held by Rahn Hills Chiropractic ("Rahn") that encumbers their residence. The issue for decision is whether Rahn's judgment lien impairs the homestead exemption claimed by the Debtors and thus is subject to avoidance under 11 U.S.C. § 522(f). Because Rahn's judicial lien impairs the Debtors' homestead exemption, an order granting the Motion will be entered.

This memorandum opinion constitutes the Court's findings of fact and conclusions of law. Fed.R.Bankr.P. 7052.

### I. Jurisdiction

The Court has jurisdiction over this contested matter pursuant to 28 U.S.C.

§§ 157 and 1334 and the general order of reference entered in this judicial district. This is a core proceeding. 28 U.S.C. § 157(b)(2).

## II. *Factual and Procedural Background*

On June 22, 2000 (the "Petition Date"), the Debtors filed a joint voluntary petition under Chapter 7 of the Bankruptcy Code (the "Code"). Prior to the Petition Date, James Smith received chiropractic treatment from Rahn. After Mr. Smith failed to pay Rahn in full for the chiropractic treatment he received, Rahn brought a collection action against him in state court. On October 15, 1999, Rahn obtained a judgment against Mr. Smith in the amount of $10,467.99 plus interest and costs. Rahn filed a certificate of judgment with the Common Pleas Court of Montgomery County, thereby creating a judicial lien on Debtors' residence, which is located at 647 Nicholas Avenue, Dayton, Ohio. The Debtors' residential real estate (the "Property") consists of a single-family, six-room (including three bedrooms and one bath), 1700–square–foot house, which, along with a two-car detached garage, is situated on a 40 by 110 foot lot. The Property is encumbered by a first mortgage with a payoff balance of $35,237.24.

The Court conducted an evidentiary hearing (the "Hearing") on the Motion and Rahn's memorandum in opposition. At the Hearing, the parties agreed that the issue of whether Rahn's judicial lien impairs the Debtors' homestead exemption will turn on the Court's valuation of the Property. Not surprisingly, the parties have markedly different views of the Property's value. In support of their contention that the Property's fair market value is $40,000, Debtors offered the testimony of Mr. Smith and the expert testimony of Conrad E. McMonigle ("McMonigle"). Rahn countered by offering the expert testimony of Thomas F. O'Neil ("O'Neil"), who opined that the fair market value of the Property is $54,000.

## III. *Legal Analysis*

### A. *Exemptions from the Bankruptcy Estate*

The filing of a petition under the Code creates an estate consisting of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). *See Owen v. Owen,* 500 U.S. 305, 308, 111 S.Ct. 1833, 114 L.Ed.2d 350 (1991) ("An estate in bankruptcy consists of all the interests in property, legal and equitable, possessed by the debtor at the time of filing, as well as those interests recovered or recoverable through transfer and lien avoidance provisions."); *Forbes v. Lucas (In re Lucas),* 924 F.2d 597, 600 (6th Cir.), *cert. denied,* 500 U.S. 959, 111 S.Ct. 2275, 114 L.Ed.2d 726 (1991) ("The filing of a bankruptcy petition under Title 11 of the United States Code creates an estate comprised of 'all legal or equitable interests of the debtor as of the commencement of the case.' ") (quoting 11 U.S.C. § 541(a)(1)). Under the Code, debtors are entitled to exempt certain property from the bankruptcy estate. *See* 11 U.S.C. § 522(b); *Owen,* 500 U.S. at 308, 111 S.Ct. 1833 ("An exemption is an interest withdrawn from the estate (and hence from creditors) for the benefit of the debtor. Section 522 determines what property a debtor may exempt."); *Holland v. Star Bank, N.A. (In re Holland),* 151 F.3d 547, 548 (6th Cir.1998) ("The Bankruptcy Code allows debtors to exempt certain property from the bankruptcy estate."); *Storer v. French (In re Storer),* 58 F.3d 1125, 1127 (6th Cir.), *cert. denied,* 516 U.S. 990, 116 S.Ct. 520, 133 L.Ed.2d 428 (1995) ("Bankruptcy Code § 522(d) entitles debtors to exempt certain property from their bankruptcy estate."). Section 522(b)(1) of the Code offers the

debtor a choice between exempting the property specified in § 522(d) or exempting the property protected by federal non-bankruptcy law or state law "unless the State law that is applicable to the debtor ... specifically does not so authorize." 11 U.S.C. § 522(b)(1). Ohio has chosen to "opt out" of the federal exemption scheme; thus, Ohio residents who file for bankruptcy relief are limited to the exemptions provided under Ohio law. *See* Ohio Rev. Code Ann. § 2329.662 (Anderson 1998).[1] *See Storer*, 58 F.3d at 1127 ("Ohio has replaced the federal exemptions with its own state exemptions, which are those generally available to debtors under Ohio's general debtor-creditor law.").

The Debtors have claimed a homestead exemption pursuant to O.R.C. § 2329.66(A)(1), which provides:

> (A) Every person who is domiciled in this state may hold property exempt from execution, garnishment, attachment, or sale to satisfy a judgment or order, as follows:
>
> (1)(a) In the case of a judgment or order regarding money owed for health care services rendered or health care supplies provided to the person or a dependent of the person, one parcel or item of real or personal property that the person or a dependent of the person uses as a residence. Division (A)(1)(a) of this section does not preclude, affect, or invalidate the creation under this chapter of a judgment lien upon the exempted property but only delays the enforcement of the lien until the property is sold or otherwise transferred by the owner or in accordance with other

applicable laws to a person or entity other than the surviving spouse or surviving minor children of the judgment debtor. Every person who is domiciled in this state may hold exempt from a judgment lien created pursuant to division (A)(1)(a) of this section the person's interest, not to exceed five thousand dollars, in the exempted property.

> (b) In the case of all other judgments and orders, the person's interest, not to exceed five thousand dollars, in one parcel or item of real or personal property that the person or a dependent of the person uses as a residence.

Ohio Rev.Code Ann. § 2329.66(A)(1) (Anderson 1998 & Supp.2001).

### B. *Impairment of the Debtors' Homestead Exemption*

#### 1. *Section 522(f)(1)*

Section 522(f)(1) of the Code permits the avoidance of judicial liens on exempt property if the lien impairs the debtor's exemption. *See Owen*, 500 U.S. at 306, 111 S.Ct. 1833 ("[Section 522(f)(1) of the Code] provides that judicial liens encumbering exempt property can be eliminated."); *Holland*, 151 F.3d at 549 ("The Bankruptcy Code allows debtors to avoid judicial liens on exempted property to the extent they impair the exemption.") (footnote omitted); *Tedeschi v. Falvo (In re Falvo)*, 227 B.R. 662, 666 (6th Cir. BAP 1998) (same); *In re Mangold*, 244 B.R. 901, 904 (Bankr.S.D.Ohio 2000) (same). Section 522(f)(1) states, in pertinent part:

> [T]he debtor may avoid the fixing of a lien on an interest of the debtor in property to the extent that such lien impairs

---

1. Ohio Revised Code ("O.R.C.") § 2329.662 provides:

   Pursuant to the "Bankruptcy Reform Act of 1978," 92 Stat. 2549, 11 U.S.C.A. 522(b)(1), this state specifically does not authorize debtors who are domiciled in this state to

   exempt the property specified in the "Bankruptcy Reform Act of 1978," 92 Stat. 2549, 11 U.S.C.A. 522(d).

   Ohio Rev.Code Ann. § 2329.662 (Anderson 1998).

an exemption to which the debtor would have been entitled under subsection (b) of this section, if such lien is—

(A) a judicial lien....

11 U.S.C. § 522(f)(1)(A). In determining whether a judicial lien impairs a debtor's exemption, a bankruptcy court must apply the mathematical calculation contained in § 522(f)(2)(A), which states:

For the purposes of this subsection, a lien shall be considered to impair an exemption to the extent that the sum of—

(i) the lien;

(ii) all other liens on the property; and

(iii) the amount of the exemption that the debtor could claim if there were no liens on the property;

exceeds the value that the debtor's interest in the property would have in the absence of any liens; ....

11 U.S.C. § 522(f)(2)(A).

Here, Rahn does not challenge the Debtors' claim of a $10,000 homestead exemption in the Property under O.R.C. § 2329.66(A)(1). Nor is it contested that Rahn's lien constitutes a "judicial lien" as defined in 11 U.S.C. § 101(36).[2] The dispute between the parties centers on valuation of the Property. Thus, before the impairment formula contained in § 522(f)(2)(A) may be applied, the fair market value of the Property must be determined.

## 2. *Valuation of the Property*

■ "Valuation outside the actual market place is inherently inexact." *Rushton v. Commissioner*, 498 F.2d 88, 95 (5th Cir. 1974). *See also Boyle v. Wells (In re Gustav Schaefer Co.)*, 103 F.2d 237, 242 (6th Cir.), *cert. denied*, 308 U.S. 579, 60

S.Ct. 96, 84 L.Ed. 485 (1939) ("The valuation of property is an inexact science and whatever method is used will only be an approximation and variance of opinion by two individuals does not establish a mistake in either."); *In re Montgomery Court Apartments of Ingham County, Ltd.*, 141 B.R. 324, 337 (Bankr.S.D.Ohio 1992) ("Valuations of real property, like projections of income and expenses, are inherently imprecise. Opinions realistically may differ, depending upon the method of valuation used and the nature of assumptions adopted."); *In re Jones*, 5 B.R. 736, 738 (Bankr.E.D.Va.1980) ("True value is an elusive Pimpernel."). Because the valuation process often involves the analysis of conflicting appraisal testimony, a court must necessarily assign weight to the opinion testimony received based on its view of the qualifications and credibility of the parties' expert witnesses. *See In re Coates*, 180 B.R. 110, 112 (Bankr.D.S.C. 1995) ("The valuation process is not an exact science, and the court must allocate varying degrees of weight depending upon the court's opinion of the credibility of ... [the appraisal] evidence.").

■ In weighing conflicting appraisal testimony, courts generally evaluate a number of factors, including the following enumerated by Chief Judge Waldron in *Buckland v. Household Realty Corp. (In re Buckland)*, 123 B.R. 573, 578 (Bankr. S.D.Ohio 1991): "the appraiser's education, training, experience, familiarity with the subject of the appraisal, manner of conducting the appraisal, testimony on direct examination, testimony on cross-examination, and overall ability to substantiate the basis for the valuation presented." A bankruptcy court is not bound to accept the values contained in the parties' ap-

**2.** Section 101(36) defines a judicial lien as one "obtained by judgment, levy, sequestra-

tion, or other legal or equitable process or proceeding." 11 U.S.C. § 101(36).

praisals; rather, it may form its own opinion of the value of the subject property after considering the appraisals and expert testimony. *See, e.g., In re Abruzzo,* 249 B.R. 78, 86 (Bankr.E.D.Pa.2000) ("I am left to some extent with the proverbial battle of the appraisers. Finding merit to both their positions, the only conclusion I can reach is to find some value in between."); *Buckland,* 123 B.R. at 578–79 (rejecting both the debtor's valuation of $45,000 and the creditor's valuation of $60,000, determining subject property to have fair market value of $48,000, and noting that "[a]lthough the court finds the testimony of the debtors' appraiser and the debtor to be persuasive, it does not find this testimony to be fully conclusive on the issue of valuation"). With these principles in mind, the Court must weigh the evidence offered by each of the parties at the Hearing in support of their respective positions regarding the Property's fair market value.

Mr. Smith testified regarding the condition of the Property. He did not offer his opinion of the Property's fair market value.[3] Mr. Smith described a number of defects in the Property. He testified that the ceilings of the bathroom and one bedroom had suffered water damage caused by a leaky roof. According to Mr. Smith, the roof needs to be replaced. Mr. Smith also stated that a plumbing leak in the bathroom has resulted in water damage to the living room ceiling. Mr. Smith noted that the Property's electrical system is antiquated and should be upgraded. (The parties' respective expert witnesses agreed that the Property's 60–amp electrical system would not meet current building codes.) Mr. Smith stated that at least one electrical outlet in the living room does not function and there is no electric service at all in the garage. He added that the Property's furnace is over eighteen years old and will soon require replacement. Finally, Mr. Smith testified that the Property's basement is in bad condition; the basement walls are damp and beginning to deteriorate. Mr. Smith conceded on cross-examination that the roof has not leaked since he repaired the flashing around the chimney and patched an area near the bathroom vent. He also acknowledged that while the furnace is old, it remains in proper working order.

As noted above, both the Debtors and Rahn offered expert appraisal testimony. Each expert witness stated that he arrived at his opinion of the Property's fair market value by utilizing the "comparable sales approach," which has been described as follows:

> Under [the "comparable sales approach"] the appraiser researches the debtor's market place to find several recent sales of similar properties. Since every piece of property is unique, the appraiser then adjusts the actual sales

**3.** Rule 701 of the Federal Rules of Evidence, which governs opinion testimony by lay witnesses, states:

If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Courts generally hold that a property owner is competent to give an opinion of the value of his/her property under Fed.R.Evid. 701. *See, e.g., Buckland v. Household Realty Corp. (In re Buckland),* 123 B.R. 573, 577 (Bankr. S.D.Ohio 1991); *Jamison v. St. Elizabeth Med. Ctr. (In re Jamison),* 93 B.R. 595, 596 (Bankr. S.D.Ohio 1988). Here, Mr. Smith offered testimony concerning the Property's condition but did not opine as to its fair market value.

prices of the comparables to account for both positive and negative differences between the comparables and the subject property. This process generates a range of adjusted sales and prices, within which the appraiser places the debtor's property in an attempt to ascertain what the debtor's property would actually sell for in its own market.

*In re SM 104 Ltd.*, 160 B.R. 202, 212 (Bankr.S.D.Fla.1993) (citing C.F. Sirmans, *Real Estate Finance* at 132–37 (2d ed.1989)). *See also In re 865 Centennial Ave. Assocs. Ltd. P'ship*, 200 B.R. 800, 804 (Bankr.D.N.J.1996) ("The sales comparison approach to valuation is a method of estimating market value by comparing the subject property to similar properties that have been sold recently. Such method uses certain adjustments up or down to the price ... to account for differences in the properties.").

The Debtors' expert witness, McMonigle, arrived at a fair market valuation of $40,000 for the Property. McMonigle has been an appraiser for thirty years. He was licensed as a real estate appraiser in 1991, shortly after Ohio's laws governing the licensing of real estate appraisers went into effect.[4] McMonigle has been certified as an appraiser by both the National Residential Appraisers Institute and the Certified Real Estate Appraisers Institute. Rahn did not challenge McMonigle's qualification to testify as an expert witness.

McMonigle personally inspected the Property. In both his testimony and his one-page appraisal report (the "Debtors' Appraisal"), which was admitted into evidence as Debtors' Exhibit 1, McMonigle noted the same defects in the Property that were described by Mr. Smith—i.e., the leaking roof, the outmoded electrical service, the old furnace and the poor con-

dition of the basement. Based upon his inspection of the Property and his consideration of four comparable sales referenced in the Debtors' Appraisal, McMonigle concluded that the Property's fair market value is $40,000.

■ Rahn offered the expert testimony of O'Neil, who has been a real estate broker for thirty years. Although he is not a licensed real estate appraiser, O'Neil has appraised real estate for the Montgomery County Probate Court for the past two years. O'Neil acknowledged on cross-examination that his formal training is limited. He has taken several appraisal courses; but most were concerned with the valuation of business enterprises. Although it was a close call, the Court, over the objection of Debtors' counsel, ruled that O'Neil was qualified to testify as an expert witness. In so doing, the Court followed those decisions holding that an experienced real estate broker may qualify as an expert for purposes of providing valuation testimony notwithstanding a lack of formal appraisal training. *See In re Robertson*, 135 B.R. 350, 352–53 (Bankr. E.D.Ark.1992) ("The debtors' appraiser has been a real estate broker for 21 years and has attended seminars on valuation. His knowledge was gained during 21 years of experience ... as a real estate broker. This has been held to be sufficient to qualify as an expert in the valuation of real property."); *Neuger v. Casgar (In re Randall Constr., Inc.)*, 20 B.R. 179, 185 (N.D.Ohio 1981) ("[Witness's] credentials as a realtor with 21 years experience in appraising properties seem more than adequate to qualify her as an expert with respect to the property in question."). *But see Donoway v. Tucker (In re Donoway)*, 139 B.R. 156, 158 (Bankr.D.Md.1992)

4. Chapter 4763 of the Ohio Revised Code governs the licensure of real estate apprais-

ers. *See* Ohio Rev.Code Ann. §§ 4763.01–.18, .99 (Anderson 2000 & Supp.2001).

("[O]nly the testimony of a qualified expert, such as an experienced appraiser, would be admissible on the issue. Real estate brokers and agents without specialized training in real estate appraising are not qualified to testify as to their opinions regarding fair market value."). While he was permitted to testify as an expert witness, O'Neil's lack of appraisal training and limited experience as an appraiser clearly affect the weight accorded to his testimony.

O'Neil, like McMonigle, made a room-by-room inspection of the Property. In O'Neil's view, the defects in the Property described by the Debtor and heavily relied on by McMonigle were overstated. O'Neil testified that the Property's roof does not need to be replaced and that the water leakage problem has been cured by the roof repairs made by the Debtors. O'Neil acknowledged that FHA/VA financing of a sale of the Property would not be possible given its dated electrical system. But O'Neil noted that this would not significantly impact the value of the Property since over 85% of homes sold in the area are financed with conventional, rather than FHA/VA, loans. O'Neil testified that the electric line to the garage had simply been disconnected and, thus, service to the garage may be restored without significant expense.

O'Neil's written appraisal (the "Rahn Appraisal") was admitted into evidence. The Rahn Appraisal, which is even more bare-boned than the Debtors' Appraisal, states in full as follows:

647 St. Nicholas Ave.
Dayton, OH 45410 $54,000

First appraisal was based on a drive-by. After a walk through of the property I discovered various and sundry items in need of repair and damage caused by the lack of repair. Therefore value of property is $54,000.

*See* Rahn Exhibit 1.

Like McMonigle, O'Neil testified that his valuation opinion was based upon use of the comparable sales method of valuation. But the Rahn Appraisal did not identify the properties chosen as comparables by O'Neil. Instead, Rahn presented a map (the "Map") that contains the addresses and locations of ten properties located near the Property. *See* Rahn Exhibit 2. O'Neil testified that he utilized seven of the ten properties listed on the Map as comparables. O'Neil stated that each of the seven comparables were located within one-half mile of the Property and were roughly equivalent in size (all having living space that is within 10% of the Property's total square footage). According to O'Neil, he obtained these comparables through a computer database known as "PACE." Based upon his review of the comparables and inspection of the Property, O'Neil concluded that the Property's fair market value is $54,000.

■ A determination of the Property's fair market value must be made by the Court based on the record developed by the parties at the Hearing. The Court's task is complicated here by the significant flaws contained in each of the appraisals. Both of the appraisals lack certain basic information that is routinely included in a residential appraisal report. For instance, neither the Debtors' Appraisal nor the Rahn Appraisal sets forth the age of the Property.[5] Little or no information was

---

5. While the age of the Property is disclosed in neither appraisal, the comparables listed in the Debtors' Appraisal were constructed between 1920 and 1925. Although there is no evidence in the record establishing the Property's age, based on the photograph contained in the Debtors' Appraisal and the age of the comparables, the Court surmises that the Property is approximately eighty to ninety years old.

offered by McMonigle, and none by O'Neil, concerning the interior features of the Property, e.g., the condition of the bath and kitchen, the age and type of windows, etc.

Perhaps the most troubling aspect of the appraisals is that while both McMonigle and O'Neil purport to employ the comparable sales valuation methodology in arriving at their respective opinions, they appear to have done so in a largely conclusory fashion. As previously discussed, the comparable sales method of valuation involves adjusting the sale price of the comparables chosen by the appraiser to account for positive and negative differences between the comparables and the subject property. But McMonigle provided the Court with very little, and O'Neil offered no, information regarding the comparables. Neither McMonigle nor O'Neil discussed—either in their appraisals or testimony—what adjustments to the comparables were made to arrive at their opinions of value. As noted above, O'Neil did not even identify which of the ten properties listed on the Map were used as his comparables. Nor did O'Neil describe the size, age, condition, sale price or sale date for the comparables listed on the Map. The Debtors' Appraisal does provide the size, age, condition, features (e.g., one-story or two-story house, number of rooms, etc.) and sale dates for the four comparables that McMonigle analyzed. But McMonigle did not describe (either in his appraisal or testimony) what adjustments were made to the comparables to arrive at his valuation of the Property. Rather, the Debtors' Appraisal summarily states, without any supporting analysis, that each of the comparables "indicated subject value [of] $40,000." *See* Debtors' Exhibit 1.

In short, each of the appraisals offered by the parties is deficient. But the Rahn Appraisal is substantially more flawed than the Debtors' Appraisal. Neither the Rahn Appraisal nor O'Neil's testimony provides the Court with sufficient information concerning the properties chosen as comparables to enable the Court to conclude that a meaningful comparable sales analysis was made. Further, the Court is persuaded that McMonigle is by far the more well-trained and experienced appraiser. For these reasons, the Court concludes that the $40,000 valuation figure contained in the Debtors' Appraisal more accurately reflects the Property's fair market value than the $54,000 amount arrived at by O'Neil.

■ While McMonigle's testimony was much more persuasive than that offered by O'Neil, the Court is not prepared to fully accept his valuation opinion. In the Court's view, McMonigle placed undue emphasis on certain of the Property's alleged defects in reaching his valuation opinion. Mr. Smith conceded on cross-examination that several of these defects were not as serious as he and McMonigle suggested in their testimony on direct examination. For example, the roof leak apparently has been cured by the Debtors' minor repairs. And there is no dispute that the lack of electrical service in the garage can be remedied by simply reattaching the electric line. Because McMonigle appears to have discounted the Property's value due to certain defective conditions that either have been or can be cured at little expense, the Court concludes that his $40,000 valuation figure should be increased by $3,000. In sum, having considered the testimony, demeanor and credibility of the witnesses, the Court determines the Property's fair market value to be $43,000.

### 3. *Application of the Impairment Formula*

■ Having determined that the Property's fair market value is $43,000, the

Court must next apply § 522(f)(2)'s impairment formula. The statutory calculation is set forth below:

| | |
|---|---|
| Rahn's judicial lien | $10,467.99 |
| Amount of mortgage | $35,237.24 |
| Exemption amount | <u>$10,000.00</u> |
| Total | $55,705.23 |
| Less: Value of the Property Absent Liens | ($43,000.00) |
| Extent of impairment | $12,705.23 |

Because the impairment amount—$12,705.23—exceeds the amount of Rahn's lien—$10,467.99, the lien is avoidable in full. *See Holland v. Star Bank, N.A. (In re Holland)*, 151 F.3d 547, 550 (6th Cir. 1998) (where "the amount of the impairment exceeds the amount of ... [the] lien [ ] sought to be avoided, the lien[ ] would be avoidable in full"); *East Cambridge Sav. Bank v. Silveira (In re Silveira)*, 141 F.3d 34, 38 (1st Cir.1998) (exemption is impaired under § 522(f) to the extent that sum of the targeted lien, other liens and the exemption amount exceed the value of the debtor's property in an unencumbered state.)

### IV. *Conclusion*

For the reasons stated above, the Court concludes that the Motion is well-taken. An order granting the Motion avoiding Rahn's judicial lien will be entered separately.